DECISION
Before this Court is the appeal of Wendy Anolik (Anolik) from a decision of the Newport Zoning Board of Review (Decision and Board respectively). The Decision granted the application of the Congregation Jeshuat Israel (Congregation) for special use permits and dimensional variances. Jurisdiction is pursuant to G.L. 1956 § 45-24-69.
 Facts and Travel
The Congregation owns Patriots Park, Tax Assessor's Plat 24, Lot 20.4 and the Touro Synagogue, Tax Assessor's Plat 24, Lot 21 both located in Newport, Rhode Island. The Touro Synagogue, the oldest Jewish synagogue in the United States built in 1763, is a national historic site. Because of the rich history, the Touro Synagogue, in addition to being a place of worship, is a tourist destination visited by individuals of various backgrounds. In 1998, the Congregation received a substantial gift from Ambassador John L. Loeb, Jr. for the purpose of acquiring two lots adjacent to Patriots Park. The Congregation subsequently purchased the two lots located at 50-52 Spring Street, Tax Assessor's Plat 24, Lot 19 (the Gray's Typewriter parcel) and 56 Touro Street, Tax Assessor's Plat 24, Lot 20 (the Barney House parcel) — which are the subject of this appeal. The Gray's Typewriter parcel and the Barney House parcel are connected to the Touro Synagogue via Patriots Park, altogether comprising the Touro Campus.
At the time the Congregation purchased the Gray's Typewriter parcel, the building on the property was used as a retail establishment on the lower floor with two residential dwelling units above. Situated on the Barney House parcel was a retail establishment with four residential dwelling units on the upper levels of the building. The Congregation intended to convert these two existing buildings into a visitor's center to provide a more intensive experience for the visitors to the Touro Synagogue. In order to accomplish this goal, the Congregation planned to demolish the building on the Gray's Typewriter parcel and replace the structure with a new building wherein permanent exhibits, restrooms, and a gift shop would be located. With respect to the Barney House structure, the Congregation sought to remove the lower, commercial level of the building restoring the building to the original colonial-era footprint. The renovated colonial-era building on the Barney House parcel would be used for archival storage and study space with an area to display traveling exhibits.
The proposed uses of both the Gray's Typewriter parcel and the Barney House parcel constitute a museum under the Codified Ordinances of the City of Newport, Rhode Island (Ordinance).[1] The Gray's Typewriter parcel and the Barney House parcel are situated in a General Business (GB) zone. A museum is permitted in a GB zone only by way of special permit. Ordinance § 17.60(B)(4). Pursuant to the Ordinance, a museum requires no fewer than ten (10) on-site parking spaces and "one additional space for each three hundred (300) square feet of gross square feet in excess of two thousand (2,000)." Ordinance § 17.104.020. Based on the plans for both buildings of the visitor's center, the Congregation would have to provide a total of twenty-five (25) on-site parking spaces in order to comply with the Ordinance. Because of the size and configuration of the already existing buildings on both parcels, no on-site parking was available. To proceed with the plans for the visitor's center, the Congregation needed special use permits and dimensional variances for both parcels.
The Congregation submitted the proposed plans for both parcels to the Newport Planning Board which found the plans consistent with the Newport Comprehensive Land Use Plan.[2] (Pet.'s Exhibits 10, 20.) The plans were also met with approval by the Newport Historic District Commission and the Interdepartmental Traffic Committee. (Pet.'s Exhibits 11, 16.) The Congregation then applied to the Board for special use permits requesting permission for both parcels to be used as a museum and for dimensional variances from the on-site parking requirements. The Board conducted three advertised public hearings on October 18, 2004; December 13, 2004; and March 7, 2005.[3] The Congregation presented four witnesses in support of the application including an expert on parking and traffic and a real estate expert.
Michael Balaban (Balaban), the Chief Executive Officer of the Touro Synagogue Foundation, testified in support of the Congregation's application. (10/18/04 Tr. at 23.) In 1947 after the United States Congress declared the Touro Synagogue a national historic site, the Touro Synagogue Foundation (Foundation), formerly known as the Society of Friends of Touro Synagogue, was established for the purpose of providing educational programs for the general public, as well as preserving the historical aspects of the Touro Synagogue. (10/18/04 Tr. at 23.) Balaban testified that a daily average of one hundred visitors toured the Touro Synagogue during the high season, and that during the low season approximately fifty people visited daily. (10/18/04 Tr. at 36.) Balaban claimed that while the proposed visitor's center and, in turn, the Touro Synagogue, will be open for longer hours than in the past, there was no projected increase in the number of visitors to the Touro Synagogue. (10/18/04 Tr. at 56, 66.) Under the current tour system at the Touro Synagogue, the visitors do not receive a full rendition of the history of the synagogue because there is no facility where the visitors can gather before and after the tour. (10/18/04 Tr. at 41.) Conversely, under the plan for the proposed visitor's center, the visitors would check into the new building on the Gray's Typewriter parcel and then proceed upstairs to view displays, artifacts, documents of history, and a short video history of the Touro Synagogue. (10/18/04 Tr. at 42.) According to Balaban, this procedure would eliminate any pre-existing problems with safety because the visitors would no longer have to await their tour while standing on the sidewalk at Touro Street with no shelter from the weather or protection from the passing traffic. (10/18/04 Tr. at 37, 43.) The visitors would then proceed through Patriots Park to the Touro Synagogue for the tour after which they could return to the visitor's center for a more focused education. (10/18/04 Tr. at 42; 12/13/04 Tr. at 31.)
The Congregation also called Holly Grosvenor (Grosvenor) from the Newport Collaborative Architects to testify in support of the application. Since 1998, the Newport Collaborative Architects had been working to make the Touro Synagogue a safer place to visit while enhancing the visitor experience by providing accessible restrooms and a gift shop.[4] (10/18/04 Tr. at 79.) Grosvenor confirmed that the Historic District Commission had approved the renovation of the Barney House, as well as the demolition of the Gray's Typewriter building. (10/18/04 Tr. at 80-82; Pet.'s Exhibit 11.) According to Grosvenor, the new building on the Gray's Typewriter parcel will be smaller than the original building,[5] and the Barney House building will be restored to its original footprint.[6] (10/18/04 Tr. at 83, 84.) In addition, the visitors' center will include a plaza between the new building on the Gray's Typewriter parcel and the restored Barney House building. (10/18/04 Tr. at 85.) Grosvenor testified that the plaza will serve a dual function by opening up the view of the Touro Synagogue and providing a safe area for elderly and disabled visitors to disembark and load buses. (10/18/04 Tr. at 85, 86.)
Allen Hodges (Hodges) testified on behalf of the Congregation as an expert on parking and traffic. (10/18/04 Tr. at 99.) Hodges testified that his review of the proposed visitor's center site, the surrounding neighborhood and streets, and the zoning code, revealed an inability for the Congregation to conform to the on-site parking requirements. (10/18/04 Tr. at 101.) As the Touro Synagogue currently exists, there is no dedicated on-site parking for the Synagogue, the Gray's Typewriter building, or the Barney House building.[7] (10/18/04 Tr. at 104.) Only Congregation staff and members of the clergy are provided with parking at two lots located on Division Street and on School Street. (10/18/04 Tr. at 104; 12/13/04 Tr. at 48.) Visitors to the Touro Synagogue are directed to public parking facilities by the tour contracts, the Touro Synagogue website, and a pamphlet distributed by the National Historic Preservation Society. (10/18/04 Tr. at 29, 32, 105-107.) Despite the lack of on-site parking for Touro Synagogue visitors, Hodges testified that over 1,000 public parking spaces are situated within 2,000 feet of the synagogue and that such spaces support the needs of the visitors to the Touro Synagogue. (10/18/04 Tr. at 106.) According to Hodges, there would be no real increase in traffic congestion in the area of the proposed visitor's center at the Touro Synagogue because the visitors will be encouraged to park elsewhere and walk to the Touro Campus. (10/18/04 Tr. at 105, 110; 12/13/04 Tr. at 51, 52.) In fact, Hodges projected that any congestion on both Touro and Barney Streets would be minimized by the addition of the plaza which would serve as an area for on and off-loading elderly or disabled visitors. (10/18/04 Tr. at 106, 108, 110.) Hodges summarized these findings and submitted his "Transportation Plan" to the Board. (Pet.'s Exhibit 15.)
Finally, Paul Hogan (Hogan), a real estate expert, testified before the Board. (12/13/04 Tr. at 76.) After inspecting the entirety of the Touro Campus, the surrounding neighborhood, and researching the comprehensive plan and pertinent zoning provisions, Hogan prepared an outline of findings which he submitted to the Board. (12/13/04 at 76-77; Pet.'s Exhibit 23.) Hogan described the area surrounding the Touro Campus from east to west as commercial and the area north to south around the Touro Campus as residential. (12/13/04 Tr. at 79-80.) Hogan opined that the new building on the Gray's Typewriter parcel and the renovated Barney House would enhance the surrounding neighborhood aesthetically. (12/13/04 Tr. at 83, 85.) With respect to parking and congestion in the neighborhood, Hogan noted that use of both lots as museums actually reduces the number of required on-site parking spaces from that required by the previous uses of both parcels. (12/13/04 Tr. at 81.) While Hogan acknowledged the problem of non-residents parking in the surrounding residential neighborhoods, he concluded that a prohibition on visitor parking in the School Street and Division Street parking lots, improved signage, and active encouragement to park in available public parking would help to reduce the problem. (12/13/04 Tr. at 82-83.) Moreover, Hogan testified that the proposed visitor's center was consistent with the goals of cultural tourism, historical preservation, and economic development contained within the Newport Comprehensive Land Use Plan. (12/13/04 Tr. 84-85.)
Anolik, who resides at 16 Division Street, adjacent to both the Division Street parking lot and the School Street parking lot, was the only remonstrant to testify at the hearing. (12/13/04 Tr. at 92, 95.) Although not qualified as an expert, Anolik testified concerning her observations of the present parking problems and traffic congestion on Division and School Streets. (12/13/04 Tr. at 93-94, 97.) Anolik claimed that the conditions of the Division Street and School Street lots had gradually deteriorated and become increasingly "jammed." (12/13/04 Tr. at 95-96.) In Anolik's opinion, the addition of a visitor's center without on-site parking would exaggerate the existing problem. Anolik submitted several photographs of Division and School Streets taken at various times depicting non-residential vehicles parked alongside the road. Other photographs submitted by Anolik portrayed the alleged overcrowding of the School Street and Division Street parking lots. Aside from objections to the parking variance, Anolik raised security concerns about the "intensification" of the Touro Synagogue. (12/13/04 Tr. at 100-102.)
The Board voted to grant the application at the March 7, 2005 hearing. Based on the evidence before it, the Board issued the Decision on April 6, 2005, granting the Congregation's request for special use permits and dimensional variances subject to seven (7) conditions. (Decision at 7.) Anolik timely filed an appeal with proper notice.
 Standard of Review
This Court has authority to review the decision of the Board pursuant to G.L. 1956 § 45-24-69. Section 45-24-69(d) provides in pertinent part:
 "(d) The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the zoning board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions, or decisions which are:
 (1) In violation of constitutional, statutory, or ordinance provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This Court's appellate review is limited to an examination of "`the entire record to determine whether `substantial' evidence exists to support the board's findings.'" Mill Realty Assocs. v.Crowe, 841 A.2d 668, 672 (R.I. 2004) (quoting De Stefano v.Zoning Bd. of Review, 122 R.I. 241, 245, 405 A.2d 1167, 1170
(1979)). Substantial evidence amounts to "`more than a scintilla but less than a preponderance.'" Id. (quoting Apostolou v.Genovesi, 120 R.I. 501, 508, 388 A.2d 824-25 (1978)). If competent, supportive evidence that a reasonable person would accept as adequate support for a conclusion exists, then the zoning board's decision must be affirmed. Id. Moreover, "the decision of a zoning board of review on a petition for an exception or variance under the zoning ordinance will not be set aside unless it clearly appears that the board acted arbitrarily and abused its discretion." Madden v. Zoning Bd. of Review,89 R.I. 131, 134, 151 A.2d 681, 683 (1959).
 Standing
Persons aggrieved by a decision of a zoning board may appeal that decision to the Superior Court pursuant to § 45-24-69. The Congregation contends that Anolik lacks standing to appeal the decision of the Board because she is not an aggrieved party. Section 45-24-31(4) defines an aggrieved party as, "(i) Any person or persons or entity or entities who can demonstrate that their property will be injured by a decision of any officer or agency responsible for administering the zoning ordinance of a city or town; or (ii) Anyone requiring notice pursuant to this chapter." It is undisputed that Anolik was not entitled to receive notice pursuant to the act; therefore, her standing must rest upon an alleged injury to her property.
Anolik resides at 16 Division Street, Newport, Rhode Island, which abuts both the School Street and Division Street parking lots utilized by the Congregation. (12/13/04 Tr. at 95.) The home is owned by the Anolik Family Limited Partnership of which Anolik is a general partner. (Wendy Anolik Affidavit at ¶ 2, 3; App. Exhibit D.) The Congregation asserts that Anolik's lack of title to the property is detrimental to her appeal of the Board's decision. However, pursuant to G.L. 1956 § 7-12-36, each partner "is co-owner with his or her partners of specific partnership property holding as a tenant in partnership," which entitles each partner to the equal right of possession. As a general partner of the partnership Anolik has an adequate possessory interest in the subject property to maintain this appeal. See 4 Arden H. Rathkopf, The Law of Zoning and Planning § 63:4 (2005) ("a person having a legal right to the possession or use of the land in some other capacity . . . is therefore considered a `person aggrieved.'"). Moreover, in Ralston Purina Co. v. WesterlyZoning Bd., the court held that a lessee had "a sufficient interest in the leased premises to permit it alone to apply for the building permit in question." 64 R.I. 197, 199, 12 A.2d 219. 220 (1940); see also Golden v. Steam Heat, Inc.,628 N.Y.S.2d 375 (N.Y.App.Div. 1995) (holding that commercial tenants had standing to enjoin the opening of a nearby adult bookstore). Thus, Anolik's position as a resident of the property and a general partner of the partnership that owns the property creates an interest in the property sufficient to maintain this appeal.
The Congregation further contends that Anolik is not aggrieved because she has not shown any injury in fact to the property at 16 Division Street. "A property owner is aggrieved within the purview of [the] statute when the property of which he is the owner is devoted to a use that would naturally be affected adversely by a decision granting an exception or a variance applicable to the land of another." D'Almeida v. Sheldon RealtyCo., 105 R.I. 317, 319, 252 A.2d 23, 24 (1969) (citing Flynn v.Zoning Bd. of Review, 77 R.I. 118, 122, 73 A.2d 808, 810
(1950)); see also Coventry Zoning Bd. of Review v. Omin Dev.Corp., 814 A.2d 889, 897 (R.I. 2003). Aggrievement may be established by demonstrating a close proximity to the property at issue. DiIorio v. Zoning Bd. of Review, 105 R.I. 357, 361,252 A.2d 350, 353 (1969); Bastedo v. Bd. of Review, 89 R.I. 420,422, 153 A.2d 531, 532 (1959). The party seeking judicial review of a decision of a zoning board has the burden of establishing aggrievement either through the record or in the pleadings.D'Almeida, 105 R.I. at 320, 252 A.2d at 24.
It is undisputed that Anolik's property located at 16 Division Street abuts the School Street and Division Street parking lots utilized by the Congregation. At the hearing before the Board, Anolik testified that excessive use of both parking lots has resulted in loud noise, traffic jams, and an invasion of Anolik's privacy. (12/13/04 Tr. at 95-98.) Moreover, the Congregation applied for a variance from the on-site parking requirements of the Ordinance. While Anolik's property is not located within a 200 foot radius of the proposed visitor's center, the proximity of the property to the parking lots, the alleged harm caused by excessive use of the parking lots, and the Congregation's request for a parking variance combined constitute adequate allegations of injury to Anolik's property. See D'Almeida,105 R.I. at 319, 252 A.2d at 24. As a result, Anolik does have standing to maintain this appeal.
 Jurisdiction
Pursuant to § 45-24-56, the zoning board of review must consist of five members. "The statutory provision that the board of review shall consist of five members is a jurisdictional requirement and cannot be altered by the parties." Bove v. Boardof Review, 95 R.I. 197, 199, 185 A.2d 751, 752 (1962). On appeal, Anolik challenges the jurisdiction of the Board claiming that the Board did not properly consist of five members at all hearings on the Congregation's petition because Brian T. McKeon (McKeon) had submitted his resignation to the Board.
Hearings in this matter commenced on October 18, 2004, at which time the Board was composed of five members: Peter J. O'Connell, Martin L. Cohen, Rebecca McSweeney, Brian T. McKeon, and Marvin Abney. These same members were present at the December 13, 2004 hearing on the Congregation's application. At the conclusion of the December 13, 2004 hearing, the Board noted that McKeon had submitted his resignation, yet McKeon had "graciously volunteered to continue in this hearing." (12/13/04 Tr. at 111.) Subsequently, at the March 7, 2005 hearing, the Board clarified the circumstances surrounding McKeon's resignation; completion of the Congregation's application was a condition precedent to McKeon's resignation. (3/7/05 Tr. at 8-9.) As a result, McKeon's resignation was not effective until the Board had rendered a decision on both petitions.
Anolik relies on the minutes of the November 10, 2004 Newport City Council Meeting, wherein the resignation of Brian McKeon is listed followed by the notation "Receive with regret." While McKeon's resignation may have been received by the Board prior to the conclusion of the Congregation's application, the resignation was not effective until accepted by the proper authority. SeePowers v. Foley, 79 R.I. 188, 196, 86 A.2d 379, 383 (1952) ("A resignation becomes effective and conclusive for all future purposes upon acceptance by the proper authority."). McKeon conditioned his resignation on the occurrence of two events: the completion of the Congregation's application and the completion of the Newport Waterfront Landing application. Although the Board was in receipt of McKeon's resignation letter, the resignation was not effective until after the Board's Decision was rendered in this case. Thus, the Board was properly composed of five active members at all pertinent times.
 The Board's Statutory Authority
On appeal, Anolik argues that the Board exceeded its statutory authority by granting special use permits because the Gray's Typewriter parcel was nonconforming by dimension and the use of the Barney House parcel was allegedly nonconforming. Anolik contends that pursuant to §§ 17.72.010 and 17.72.030 of the Newport Ordinance any change in use of a nonconforming development requires a use variance unless the use is permitted by right.
Anolik's contention that the Gray's Typewriter parcel is nonconforming by dimension is completely without merit. While it was undisputed that the Gray's Typewriter parcel measured 2,628 square feet when § 17.60.030 of the Ordinance required a minimum lot size of 5,000 square feet, pursuant to the Board's Decision at the request of the Congregation, the Gray's Typewriter parcel and the Barney House parcel were merged to create one single lot measuring in excess of 7,700 square feet. See Pascalides v.Zoning Bd. of Review, 97 R.I. 364, 369, 197 A.2d 747, 751 (1964) ("The applicant was entitled to have its land treated as one lot for its purpose in seeking to obtain relief from the zoning board. . . ."). In fact, the Board in its Decision made the following finding with regard to the Gray's Typewriter parcel:
 "8. Although Lot 19 containing the Gray's Typewriter building is smaller than the required 5,000 square feet for a conforming lot in the General Business district, the petitioner has agreed to merge the two lots to create a single conforming lot well exceeding 5,000 square feet in area." (Decision at 3.)
Moreover, the Board conditioned the grant of the application on the Gray's Typewriter parcel and the Barney House parcel merging into one lot. (Decision at 7.) As a result, the dimensional nonconformance was eliminated making § 17.72.010[8] of the Ordinance inapplicable to the Congregation's application.
With respect to the Barney House parcel, Anolik asserts that the prior use of that land was nonconforming and that the Congregation was required to obtain a use variance in order to change the use to one other than that permitted by right. Anolik argues that because a museum use requires a special use permit, it is not a use permitted by right. According to Anolik, pursuant to the Ordinance § 17.72.030, the Congregation was required to apply for the more stringent use variance.
As a preliminary matter, it is unclear from the record whether the prior use of the Barney House parcel was a legal nonconforming use or a wholly illegal use.[9] However, assuming that the prior use of the Barney House parcel was nonconforming, nothing in the Ordinance prevents a change from a legal non-conforming use to a use permitted only by special permit. Specifically, § 17.72.030(C) of the Ordinance provides, "No nonconforming use of a structure or a nonconforming structure shall be changed except to a conforming use or structure." Although not permitted by right, a use which is permitted by special permit under the zoning ordinance is a conforming use.See Appeal of Barefoot, 263 A.2d 321, 325 (Pa. 1969) ("When a special exception is granted, the use becomes a conforming use. . . ."); see also 3 Arden H. Rathkopf, The Law of Zoningand Planning § 61:11 (2005) ("[A] special exception allows a property owner to put his property to a use which the ordinance expressly permits."). Therefore, the change in use of the Barney House parcel to a museum pursuant to a special permit is statutorily permissible.
Lastly, because the language of § 17.108.020 of the Ordinance does not expressly authorize the Board to grant a dimensional variance in conjunction with a special use permit, Anolik asserts that the Board acted in excess of its statutory authority. Anolik does not cite any authority for this position, but presumably relies upon Newton v. Zoning Bd. of Review, 713 A.2d 239, 241
(R.I. 1998). In Newton, the court held that a dimensional variance could not be granted in conjunction with a special use permit where the language of the ordinance specifically required that an applicant for a special use permit comply with the dimensional requirements of that ordinance. Id. at 242. Conversely, § 17.108.020(B) authorizes the Board to vary the terms of a special use permit "except as it pertains to the maximum number of dwelling units per lot." Contrary to the ordinance in Newton, the Ordinance does not expressly require conformance with the dimensional standards. As a result, the Board did not exceed its authority or violate statutory provisions by granting dimensional relief in conjunction with the special use permit.
 Dimensional Relief
The Ordinance authorizes the grant of a dimensional variance when credible evidence establishes:
 "a. That the reasons set forth in the application justify the granting of the variance and that the variance, if granted, is the minimum variance that will make possible the reasonable use of the land, building or structure;
 b. That the variance will not be injurious to the neighborhood or otherwise detrimental to the public welfare and will not impair the intent or purpose of the zoning code or the comprehensive plan upon which this zoning code is based;
 c. That the hardship from which the applicant seeks relief is due to the unique characteristics of the subject land or structure and not to the general characteristics of the surrounding area; and is not due to a physical or economic disability of the applicant; and
 d. That the hardship is not the result of any prior action of the applicant and does not result primarily from the desire of the applicant to realize greater financial gain." Ordinance § 17.108.010(B)(5).
When granting a dimensional variance, the Board must be satisfied that the "hardship that will be suffered by the owner of the subject property if the dimensional variance is not granted shall amount to more than a mere inconvenience." Ordinance § 17.108.010(B)(6)(b). More than a mere inconvenience means that the relief "is reasonably necessary for the full enjoyment of the permitted use." DiDonato v. Zoning Bd. of Review, 104 R.I. 158,165, 242 A.2d 416, 420 (1968).
Anolik claims that the Board erred in granting the dimensional relief from the on-site parking requirements for both parcels because the relief sought was not the only alternative and the variance will be detrimental to the public welfare. However, substantial evidence in the record supports the Board's decision to grant dimensional relief. Allen Hodges, an expert on traffic and parking, testified that the composition of the parcels created an inability to provide on-site parking. According to Hodges, any on-site parking would destroy the setting of the Touro Synagogue. In fact, none of the required forty (40) on-site parking spaces for the prior uses of the lots existed when the Congregation acquired the property. Hodges testified that the Congregation's aggressive promotion of the use of other public parking facilities would cure the lack of on-site parking. Moreover, Balaban testified that there was no projected increase in the number of visitors to the Touro Synagogue, and only an intensification of the visitors' educational experience would result from the visitor's center. According to the testimony of both Hodges and Paul Hogan, the real estate expert, the lack of on-site parking would not adversely affect the surrounding neighborhood. The Newport Interdepartmental Traffic Commission's approval of the visitor's center plans was also submitted to the Board in support of the application. Thus, the Board had before it reliable evidence to support a finding that dimensional relief from the on-site parking requirements was reasonably necessary for the full enjoyment of the property.
 Special Use Permit
The Board may grant a special use permit after finding that the proposed use is in accordance with the public convenience and welfare. In making that determination, the Board must consider the following factors, where appropriate:
 "1. The nature of the proposed site, including its size and shape and the proposed size, shape and arrangement of the structure;
 2. The resulting traffic patterns and the adequacy of proposed off-street parking and loading;
 3. The nature of the surrounding area and the extent to which the proposed use or feature will be in harmony with the surrounding area;
 4. The proximity of dwellings, churches, schools, public buildings, and other places of public gathering;
 5. The fire hazard resulting from the nature of the proposed buildings and uses and the proximity of existing buildings and uses;
 6. All standards contained in this zoning code;
 7. The comprehensive plan for the city."
 Ordinance § 17.108.020(G).
"`The rule, [is] that satisfaction of a "public convenience and welfare" pre-condition will hinge on a showing that a proposed use will not result in conditions that will be inimical to the public health, safety, morals and welfare.'" Salve ReginaCollege v. Zoning Bd. of Review, 594 A.2d 878, 880 (R.I. 1991) (quoting Nani v. Zoning Bd. of Review, 104 R.I. 150, 156,242 A.2d, 403, 406 (R.I. 1968)). Anolik claims that the substantial evidence does not support the Board's conclusion that the proposed visitor's center is in accord with the public convenience and welfare. Based on a review of the whole record, this contention is unpersuasive.
The Congregation presented two experts in support of the application. Hogan, the real estate expert, testified concerning the impact of the visitor's center on the surrounding area and the consistency of the proposed use with the comprehensive plan. Additionally, the Board heard from a parking and traffic expert who concluded that the visitor's center would not increase the problem of congestion in the area. Holly Grosvenor submitted the architectural plans to the Board and explained that the proposed visitor's center was actually smaller than the pre-existing buildings on both parcels which would result in a better aesthetic view of the Touro Synagogue. The only evidence presented in opposition to the application was the testimony of Anolik, a lay witness. See Toohey v. Kilday, 415 A.2d 732,737 (R.I. 1980) ("[T]he lay judgments of neighboring property owners on . . . the effect of the proposed use on neighborhood property values and traffic conditions have no probative force in respect of an application . . . for a special exception."). The Board found that the proposed visitor's center would improve the surrounding area aesthetically; the proposed use was appropriate for the neighborhood; the visitor's center would not negatively impact the traffic and congestion in the surrounding area; and the proposed use of the parcels was consistent with the comprehensive plan for the city of Newport. (Decision at 6.) Further, to insure that the use of the property would not be inimical to the public health and safety, the Board imposed seven conditions on the special use permits. (Decision at 7.) Accordingly, the Board had before it competent evidence to support the grant of the special use permits.
 Conclusion
After a review of the entire record, this Court finds that the Decision of the Board granting dimensional relief and special use permits for the two parcels is not clearly erroneous, not in violation of ordinance provisions and is supported by substantial evidence. Furthermore, the Board did not exceed its statutory authority. The Decision was not made upon unlawful procedure. Substantial rights of the appellant have not been prejudiced. Therefore, the Decision of the Board is affirmed.
Counsel shall submit the appropriate judgment for entry.
[1] "`Museum' means . . . a building serving as a repository for natural, scientific, historical, or literary collections or objects of interest, or works of art, and arranged, intended and designed to be used by members of the public for viewing, with or without an admission charge, and which may include as an accessory use the sale of goods to the public as gifts or for their own use." Codified Ordinances of the City of Newport, Rhode Island § 17.08.010 (hereinafter Ordinance).
[2] The Planning Board recommended that no buses be allowed to park in the two parking lots owned by the Congregation on School Street and Division Street. Furthermore, the Planning Board urged the Congregation to improve signage at the School Street and Division Street parking lots and actively discourage Touro Synagogue visitors from parking in the historic hill area. (Pet.'s Exhibits 10, 20.)
[3] The initial application filed by the Congregation pertained solely to the Gray's Typewriter parcel. The Board considered the application at an advertised public hearing on October 18, 2004. Atthe outset of the hearing, counsel for Anolik objected to the Congregation's alleged attempt at "piecemeal zoning" arguing that the Board should consider the applications for changes to both the Gray's Typewriter parcel and the Barney House parcel together. (10/18/04 Tr. at 5.) In response to the objection, the Congregation subsequently filed an application for the Barney House parcel and requested that it be consolidated with the Gray's Typewriter application. (12/13/04 Tr. at 3-4.)
[4] As the Touro Synagogue currently exists, there are no easily accessible restrooms. (10/18/04 Tr. at 88.)
[5] The new building on the Gray's Typewriter parcel will be two stories, approximately 3,000 square feet. (10/18/04 Tr. at 86; Pet.'s Exhibit 13.)
[6] The Barney House will be reduced to a three-story building, approximately 3,000 square feet by removing the bottom commercial level. (10/18/04 Tr. at 89, 90.)
[7] At the time of the hearing, the Barney House building was being used as a multi-family apartment building with a commercial retail establishment on the lower floor. Twenty-two on-site parking spaces for that use of the Barney House were required under the Ordinance, yet none was provided. (12/13/04 Tr. at 46.)
[8] While it is unclear what subsection Anolik relies upon, § 17.72.010 generally deals with substandard lots of record or lots that are non-conforming by dimension.
[9] It was undisputed that the Barney House was used as a multi-family dwelling which is permitted in a GB zone only by way of special permit. Ordinance § 17.60.020(B)(1). However, there was no evidence presented concerning when the use was established or whether a special permit had been issued for the use of the premises as a multi-family dwelling.